UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

JAYMIN V.,                                    :
           Plaintiff,                    :
                            :
           v.                            :      C.A. No. 24-00064MSM
                            :
MICHELLE KING,                                :
Acting Commissioner of Social Security,       :
           Defendant.                    :

**REPORT AND RECOMMENDATION**

PATRICIA A. SULLIVAN, United States Magistrate Judge.

On February 3, 2021, Plaintiff Jaymin V., then a child of seventeen, applied for Supplemental Security Income ("SSI"). Tr. 15. A week later, on February 10, 2021, Plaintiff turned eighteen, shifting the analytic framework for his SSI application from the childhood standard that applies to the period from application until the birthday, to the adult standard, which is applicable thereafter. Id. As a child and continuing when he became an adult, Plaintiff has been diagnosed with and treated for anxiety, which his principal treating psychiatrist, Dr. Amy Egolf described as "severe panic disorder and agoraphobia that has interfered to an extreme degree with daily functioning, including impairment of school attendance and less and less time leaving the house." Tr. 662; see, e.g. Tr. 125, 501-02. Plaintiff also has been diagnosed with attention deficit hyperactivity disorder ("ADHD"), irritable bowel syndrome ("IBS") and acid reflux. Tr. 20. Despite these impairments, an administrative law judge ("ALJ") found that Plaintiff retained the RFC[1] to perform simple tasks and maintain pace for a forty-hour workweek, with collaborative contact with coworkers and supervisors but not the general public.

---

[1] RFC refers to residual functional capacity, which is "the most you can still do despite your limitations," taking into account "[y]our impairment(s), and any related symptoms, such as pain, [that] may cause physical and mental limitations that affect what you can do in a work setting." 20 C.F.R. § 416.945(a)(1).

Tr. 30.  Based on testimony of a vocational expert, the ALJ concluded that Plaintiff has not been disabled at any relevant time.  Tr. 28, 30, 38-39.  The SSI application in issue is Plaintiff's second application.  See Tr. 124.  His first was a childhood disability application that was denied following reconsideration-phase findings that "[symptom]s of agoraphobia and panic attacks improved since onset of psych t[reatment]" based on a file review by a psychologist and a psychiatrist.  Tr. 124, 127, 130, 134.

Plaintiff's motion for remand challenges the ALJ's decision as tainted by multiple errors. These are: first, reliance on the non-examining experts whose findings rest on their review of a materially incomplete file; second, the rejection of the treating source opinions of the treating psychiatrist, Dr. Egolf, and of Plaintiff's pediatrician, Dr. Joseph Singer; and, third, the discounting of Plaintiff's credibility, including with regard to the combined effect of his physical impairments (IBS and acid reflux) and anxiety.  ECF No. 10-1 at 17-26.  Plaintiff asks the Court to return the matter for an award of benefits or alternatively for further proceedings.  Id. at 26. The Commissioner's counter motion (ECF No. 11) asks the Court to affirm because the ALJ's decision is consistent with applicable law and supported by substantial evidence.  The parties' motions have been referred to me for preliminary review, findings and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B).

## I.    **Background**

### A.    **Record Reviewed by Non-Examining Experts**

Plaintiff lives with his mother, plays video games into the night, causing sleep issues, and has a handful of work attempts but no work history.  See Tr. 77-80, 83.  As far as the record reflects, he began receiving significant mental health treatment and educational interventions due to mental health issues at the age of fourteen, when Plaintiff was diagnosed with "delayed sleep

phase syndrome" with psychological factors and adjustment disorder based on the pattern of difficulty falling asleep.  Tr. 312, 487.  At the sleep clinic, a psychologist labeled his "[c]urrent [i]llness [s]everity" as "marked."  Tr. 489.  Plaintiff has been treated with antidepressant medication (Zoloft) for depression and social phobia since age fifteen.  Tr. 462.  Plaintiff's treatment with Dr. Egolf began when he was partially hospitalized at Bradley Hospital in 2019 at the age of sixteen and was treated with medication and other interventions for panic disorder with agoraphobia featuring an escalating pattern of avoidance with increasing panic attacks.  Tr. 480-83.  Attendance at a gym was initiated as part of treatment.  Tr. 482; see Tr. 541 (curated trip to gym during partial hospitalization).  At Bradley Hospital, Plaintiff's mental status examinations ("MSEs") reflect adverse observations.  Tr. 484-85.

While in school during childhood, Plaintiff struggled with significant attendance issues, including both absence and tardiness, as well as extreme fatigue and inattention.  Tr. 312-13 (psychological evaluation indicates issues are attendance, fatigue and organization; evaluator notes that friends are "online" with diagnoses of depression, ADHD, social anxiety disorder); Tr. 322 (education evaluation indicates student absent and tardy, involved with truancy court since middle school, observed to be fatigued); Tr. 499 (has good grades but attendance issues). Plaintiff's treating record consistently reflects that the structure and supportive environment of school helped with his symptoms.  E.g., Tr. 757 ("[symptom]s better when: Structured, supported at school").  While the current application was pending, in June 2021, Plaintiff's counselor noted that he had just graduated from high school.  Tr. 924 ("He did graduate.").  Overall, Plaintiff's school performance resulted in the finding of "[n]o needs noted in academic areas," though educators considered his school achievements to be below his average intellectual capacity.  Tr. 335.  While Plaintiff was in high school, his employment history features three

brief work attempts, for example at McDonalds, where he worked for a short period during 2020. Tr. 285-86.

Plaintiff's medical history is complicated by the onset of the COVID-19 pandemic in March 2020. Due to the pandemic, the record reflects that Plaintiff's anxiety increased, while the functional impact of agoraphobia was reduced because it became acceptable for Plaintiff to attend school and treatment without leaving home. See Tr. 716-21; see also Tr. 744 (Plaintiff "has had more anxiety about death with the Covid 19 crisis . . . . He is doing well with distance learning.); Tr. 748 (Plaintiff "has had less anxiety because he is not going out"). And because much of Plaintiff's treatment was conducted telephonically, mental health professionals were unable to perform complete mental status examinations ("MSEs"). E.g., Tr. 878 (aspects of MSE labeled as "[u]nable to assess (phone)"). Soon after the onset of the pandemic, treating notes reflect that Plaintiff discontinued medication for ADHD because he and his mother believed it increased anxiety. Tr. 745.

The foregoing constitutes the record reviewed by Dr. Therese Harris, the initial phase non-examining expert psychologist. For reconsideration, the additional treating records examined by the non-examining expert psychologist Dr. Marsha Hahn include two post-eighteen/post-high school appointments with the treating psychiatrist Dr. Egolf (in July and August 2021), at which Dr. Egolf noted that she had "increased [Prozac] . . . with good effect," Tr. 760, and that Prozac had reduced panic attacks to "now and then," with frequency "unclear," Tr. 756. Dr. Egolf also recorded that, at the higher dose, she observed "[n]o improvement . . . and worsening **anxiety** and mood" and planned to switch medication. Tr. 760-61 (emphasis in original). She also noted that Plaintiff's other symptoms did not improve: "[t]ried higher dose of . . . Prozac . . . [n]o improvement . . . played video games last night and went to sleep at 4 AM . .

. [r]acing thoughts are around most of the day . . . [a]nxious thoughts interfere with sleep . . . [s]ome trouble falling asleep . . . [l]eaving the house rarely . . . [s]eems exhausted most of the time." Tr. 756-57. The final records in the file-review set are from Dr. Singer, the treating pediatrician, who noted that Plaintiff's mother believed the new medication (Lexapro) was helping, that there had not been panic attacks in a while, but that Plaintiff worried, had racing thoughts and "spends a lot of time at home playing video games online." Tr. 786. Also seen by Dr. Hahn were notes of several appointments with Dr. Singer noting Plaintiff's physical complaints (e.g., Tr. 786 ("I think I have IBS")[2]; Tr. 792 ("chest symptoms")[3]; Tr. 796 ("[s]tinging on . . . head"); Tr. 799 (nosebleeds).

B.    Post-File-Review Record

The materially significant records that were unseen by both Dr. Harris and Dr. Hahn begin with Dr. Egolf's October 2021 treating note reflecting her conclusion that the switch from Prozac to Lexapro was not having a positive effect in that anxiety and depression continued, and Plaintiff had other side effects; this caused her to propose yet another medication change. Tr. 874. By the end of 2021, Dr. Egolf noted clinical observations that, despite Lexapro, "just doing simple tasks is hard," with multiple adverse findings on MSE. Tr. 869-75. This period of what Dr. Egolf labeled as medication "ups and downs," Tr. 894, led to a December 2021 discussion with a physician in Dr. Egolf's practice of the clinical "pros and cons" of a medication taper. Tr. 876. Based on this medical guidance,[4] Plaintiff made the decision to stop all medication; the

_____

[2] Subsequent records reveal that Dr. Singer's belief that "it is unlikely he has inflammatory bowel disease," Tr. 825, was well founded in that extensive clinical examination by a gastroenterologist resulted in a diagnosis of antral gastritis; almost all findings on endoscopy and colonoscopy were benign or normal. Tr. 103.

[3] Based on benign testing in emergency room, Dr. Singer noted that Plaintiff's chest pain was probably a "precordial catch." Tr. 792.

[4] With no non-examining expert to rely on and ignoring the relevant treating source (Dr. Egolf), the ALJ's decision reflects his interpretation that the January 2022 decision to discontinue all psychiatric medications was "against the

medication taper began in December 2021 under physician monitoring. Tr. 876-89. By April 2022, panic attacks had increased significantly and Dr. Egolf recommended the resumption of medication. Tr. 890-95. Her May 2022 treating note confirms this dramatic worsening of symptoms from the medication taper: "Current Illness Severity: marked." Tr. 902. However, the first medication she prescribed had very significant adverse side effects and was quickly discontinued. Tr. 896. Next, Dr. Egolf introduced Cymbalta, which was titrated up and supplemented by two partial hospitalizations. Tr. 904-10.

At discharge from the second hospitalization, Plaintiff's panic attacks had reduced, but his "[g]eneral anxiety is coming up." Tr. 910. By September 2022, Dr. Egolf's treating note reflects her clinical conclusion that, despite the resumption of medication, Plaintiff is still "[n]ot comfortable enough to leave the house . . . [g]ets stuck on anxious thoughts . . . [t]oo anxious to drive." Tr. 916-20; see Tr. 920 ("is rarely leaving the house"). Plaintiff's difficulties with medication to treat his mental impairments is captured in Dr. Egolf's well-supported and uncontradicted November 2022 opinion that, over the years of her treating relationship with Plaintiff, he had "limited response to medication interventions." Tr. 1000. A post-hearing record from December 2022 (shortly after the ALJ hearing) that was submitted to the Appeals Council similarly summarizes Plaintiff's struggle with medication treatment during the pre-hearing period: "has trialed several antidepressants without good effect." Tr. 47.

In addition to these mental health records reflecting a period of significant worsening of symptoms, the post-file review record contains treating notes from the pediatrician, Dr. Singer,

---

advice of his treating providers." Tr. 31. Having reviewed this part of record with care, I conclude that this is an improper and seemingly inaccurate lay interpretation of a complex medical record. Indeed, if I were able to make a finding about the decision by providers to assist Plaintiff with a medication taper (which I lack the medical training and experience to do), I would find that Plaintiff's providers were very concerned by Plaintiff's difficulties with and limited response to medication and were therefore supportive of Plaintiff's decision to try a medication taper. See Tr. 876.

who was monitoring Dr. Egolf's ongoing treatment including Plaintiff's struggle with his anxiety/agoraphobia symptoms and medication. Tr. 813-33. For example, Dr. Singer noted Plaintiff's report that Prozac was "not helping a lot; more damage to health than helping." Tr. 827. Dr. Singer also noted Plaintiff's significant complaints of gastric difficulties despite testing that revealed only gastritis. Tr. 827-29; see Tr. 963 (during mental health hospitalization at Fatima Hospital, provider notes Plaintiff "feels stress in his body as indigestion"). Because of Plaintiff's mental health crisis in 2022, Dr. Singer signed off on an FMLA leave for his mother based on the opinion that Plaintiff's "debilitating anxiety [and] depression" was about to require (and did require) partial hospitalization. Tr. 995-99.

Also in the post-file review record is the evidence of Plaintiff's fourth work attempt, which began shortly before the ALJ hearing. Specifically, beginning on October 9, 2022, and continuing at least through the November 14, 2022, hearing, Plaintiff worked part time at a Harley-Davidson facility sorting parts in the back. Tr. 77-78, 440-42. At the ALJ hearing, Plaintiff testified that he was finding that leaving home for this work was "a struggle." Tr. 78. As Plaintiff explained, this job had been arranged for him by a neighbor who also took Plaintiff to and from work, and during the limited (just over one month) period of part-time employment preceding the ALJ hearing, Plaintiff missed work twice, sometimes was late and sometimes was sent home early due to anxiety. Tr. 81-82. Unseen by the ALJ is a record submitted to the Appeals Council, which reveals that by December 6, 2022, Plaintiff was again unemployed. Tr. 47. According to this treatment note made by a psychiatric treatment provider at Angell Street Psychiatry, Plaintiff had "stopped [working as a 'parts associate' at Harley-Davidson] inn (sic) part due to anxiety." Id.

C.    ALJ's Decision

7

The ALJ denied the current application in reliance on Plaintiff's relative success in school, his attendance at a gym,[5] his many reports of being sometimes able to leave the home to see friends,[6] his playing video games[7] and his part-time work at Harley-Davidson during the month preceding the hearing.[8]  Tr. 21-26, 30-35.  The ALJ also relied on the file-review findings of two non-examining expert psychologists, Dr. Harris at the initial phase and Dr. Hahn at the reconsideration phase, which he found to be generally persuasive.  Tr. 24-27, 31-36.  Mindful that these non-examining experts did not see a substantial portion of the medical record (over two hundred pages), which reflects the significant worsening of symptoms in the course of Plaintiff's ongoing struggle as a young adult with medication management, the ALJ performed his own lay interpretation of the post-file-review material.  Tr. 34-37.

This seriously flawed approach resulted in the ALJ's rejection as unpersuasive of the opinion of Plaintiff's longtime (since July 1, 2019) treating psychiatrist, Dr. Egolf of Bradley Hospital, who was Plaintiff's attending psychiatrist during the 2019 partial hospitalization at Bradley and continued as the principal outpatient treating source after discharge.  Tr. 36; see Tr. 480, 756.  Signed on November 7, 2022, and referencing the entire period of treatment since July

---

[5] As noted *supra*, leaving the house to go to the gym was medically recommended treatment, with at least some of the attendance curated by treating mental health professionals.  The ALJ's decision ignores this context.

[6] The ALJ is right that the record is replete with references to Plaintiff's seeing "friends," as reported to mental health providers.  For some of these references, the record includes Plaintiff's report that these outside-the-home contacts resulted in panic attacks, sometimes causing Plaintiff to return home.  E.g., Tr. 482 ("he even went away from home with friends, which was something he had avoided for some time"); Tr. 512 ("[l]ast [panic attack] at friend[']s house . . . continued to stay with friends during this time"); Tr. 762 (had two panic attacks while "out with friends"); but see Tr. 890 ("he couldn't get together with friends because he might panic").

[7] As noted *supra*, Plaintiff's playing of video games long into the night, causing him to be fatigued or to sleep much of the day, was treated by mental health professionals as a symptom.  E.g., Tr. 756, 923.  The ALJ's lay interpretation of the record ignores this.

[8] As noted *supra*, Plaintiff testified that his work attempt at Harley-Davidson failed in that, over a one-month period of part-time work, he was absent twice due to anxiety, was late or sent home early due to anxiety, and, after less than two months, it ended due to anxiety.  The ALJ adverted to this testimony but does not directly state why he discredited it.

1, 2019, Dr. Egolf opined that Plaintiff has panic disorder with agoraphobia and depressive disorder (recurrent, moderate), with "limited response to medication interventions," that his fear of a panic attack "constantly" limits his ability to function ("significant incapacitation") and that his condition would cause him to be absent more than four days a month and to be late or leave early more than four days a month.  Tr. 1000-002.

To support the determination that this opinion has "little persuasive value," Tr. 36, the ALJ found that Dr. Egolf used a checkbox form and based her opinion on little more than her acceptance of Plaintiff's subjective statements to her.  Id.  The ALJ also found Dr. Egolf's opinions to be inconsistent with the treating record primarily in reliance on his lay analysis of the extensive and complex post-non-examining-review medical records described above, which reflect Plaintiff's ongoing struggle with medication management and a significant exacerbation of symptoms as providers shifted dosage and medication, including the taper that culminated in no medication in April 2022 resulting in multiple panic attacks a day (Tr. 890).  E.g., Tr. 33-35 (analysis of Tr. 801-1003).  Finally, the ALJ rejected as "speculative" Dr. Egolf's opinion regarding absenteeism and arriving late or early, Tr. 36; he relied instead on the lay finding that Plaintiff's absenteeism at the partial hospitalization program (which Dr. Egolf referenced to illustrate her opinion that he cannot reliably attend work) was caused not by any mental health symptoms, but rather by Plaintiff's decision to stay up late playing video games.  Tr. 36-37. Based on this finding, the ALJ gave no further consideration to attendance issues; instead, he relied without further analysis on the non-examining experts' findings that Plaintiff could sustain a forty-hour workweek, which he found was confirmed by Plaintiff's part-time job at Harley-Davidson.  Tr. 36.

The ALJ also rejected as having "little persuasive value," Tr. 37, the opinion of Dr. Singer, Plaintiff's pediatrician, who opined that the mother's FMLA leave from June 2, 2022, to August 24, 2022, was appropriately based on Plaintiff's "debilitating anxiety + depression," leaving him "unable to work or go to school" and needing partial hospitalization. Tr. 995-99. The ALJ found that at least some of the functions checked (e.g., hygiene, bathing) are matters that the rest of the record makes clear Plaintiff can do without difficulty, as well as that the Singer opinion lacks a function-by-function assessment. Tr. 37. The ALJ did not mention, but the Court notes, that this form indicates that the need for the mother's FMLA leave would end on August 24, 2022, soon after Plaintiff's discharge from the second partial hospitalization; there is no evidence that it was renewed.[9]

Finally, the ALJ relied on his finding that Plaintiff's statements were not entirely consistent with the medical evidence and other evidence of record. Tr. 31. This finding is difficult to unpack as it is unclear what statements the ALJ had in mind. At bottom, the ALJ's treatment of Plaintiff's subjective statements appears to focus on the testimony regarding the degree to which Plaintiff struggled to leave the home without serious emotional difficulty by juxtaposing this testimony with the ALJ's lay interpretation of the post-file-review worsening in 2022: "symptoms remained largely stable and they were adequately managed when he took medication as prescribed and followed through with treatment recommendations, including participation in therapy." Id. And the ALJ failed to explain why he discredited other uncontradicted statements – for example, Plaintiff's testimony about his inconsistent attendance at the part-time Harley-Davidson job during the one month that he held it.

## II.    Standard of Review

---

[9] Records submitted to the Appeals Council indicate that Plaintiff's mother asked Dr. Singer to extend it but there is no evidence that it was extended. Tr. 103.

As long as the correct legal standard is applied, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §§ 405(g), 1383(c)(3); see Purdy v. Berryhill, 887 F.3d 7, 13 (1st Cir. 2018). "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." Biestek v. Berryhill, 587 U.S. 97, 103 (2019). Substantial evidence "means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Id. (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Though the difference is quite subtle, this standard is "somewhat less strict" than the "clearly erroneous" standard that appellate courts use to review district court fact-finding. Dickinson v. Zurko, 527 U.S. 150, 153, 162-63 (1999) (cited with approval in Biestek, 587 U.S. at 103). Thus, substantial evidence is more than a scintilla – it must do more than merely create a suspicion of the existence of a fact and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. Irlanda Ortiz v. Sec'y of Health & Hum. Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam).

Once the Court concludes that the decision is supported by substantial evidence, the Commissioner must be affirmed, even if the Court would have reached a contrary result as finder of fact. Rodriguez Pagan v. Sec'y of Health & Hum. Servs., 819 F.2d 1, 3 (1st Cir. 1987) (per curiam); Lizotte v. Sec'y of Health & Hum. Servs., 654 F.2d 127, 128 (1st Cir. 1981). The determination of substantiality is based upon an evaluation of the record as a whole. Frustaglia v. Sec'y of Health & Hum. Servs., 829 F.2d 192, 195 (1st Cir. 1987) (per curiam); Brown v. Apfel, 71 F. Supp. 2d 28, 30 (D.R.I. 1999); see Parker v. Bowen, 793 F.2d 1177, 1180 (11th Cir. 1986) (per curiam) (court must consider evidence detracting from evidence on which Commissioner relied). The Court's role in reviewing the Commissioner's decision is limited.

<u>Brown</u>, 71 F. Supp. 2d at 30.  The Court does not reinterpret or reweigh the evidence or otherwise substitute its own judgment for that of the Commissioner.  <u>Thomas P. v. Kijakazi</u>, C.A. No. 21-00020-WES, 2022 WL 92651, at *8 (D.R.I. Jan. 10, 2022), <u>adopted by text order</u> (D.R.I. Mar. 31, 2022).

If the Court finds either that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim, the Court may remand a case to the Commissioner for a rehearing under Sentence Four of 42 U.S.C. § 405(g).  <u>Allen v. Colvin</u>, C.A. No. 13-781L, 2015 WL 906000, at *8 (D.R.I. Mar. 3, 2015).  If the Court finds that a judicial award of benefits would be proper because the proof is overwhelming, or the proof is very strong and there is no contrary evidence, the Court can remand for an award of benefits.  <u>Sacilowski v. Saul</u>, 959 F.3d 431, 433, 440-41 (1st Cir. 2020); <u>Randy M. v. Kijakazi</u>, C.A. No. 20-329JJM, 2021 WL 4551141, at *2 (D.R.I. Oct. 5, 2021), <u>adopted by sealed order</u> (D.R.I. Oct. 28, 2021).

## III.    <u>Disability Determination</u>

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 1382c(a)(3)(B); 20 C.F.R. § 416.605.  The impairment must be severe, making the claimant unable to do previous work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 1382c(a)(3)(B); 20 C.F.R. §§ 416.905-11.

### A.    **Child Standard – Impairment Functionally Equal to Listing**

Claimants under the age of eighteen are treated as children and may be considered disabled and entitled to SSI benefits if the child "has a medically determinable physical or

mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(C)(i); see Shaniece D. o/b/o A.D. v. O'Malley, C.A. No. 23-112-WES, 2024 WL 79897, at *3 (D.R.I. Jan. 8, 2024), adopted by text order (D.R.I. Mar. 13, 2024).  The Social Security regulations include a three-step test for the purpose of adjudicating children's disability claims under this standard.  20 C.F.R. § 416.924(a)-(d).  That test requires the ALJ to determine: (1) whether the child is engaged in "substantial gainful activity," (2) whether the child has "a medically determinable impairment[ ] that is severe," and (3) whether the child's "impairment(s) . . . meet, medically equal, or functionally equal [a] list[ed impairment]."  Id. § 416.924(b)-(d).  "The claimant seeking [childhood] benefits bears the burden of proving that his or her impairment meets or equals a listed impairment." Hall ex rel. Lee v. Apfel, 122 F. Supp. 2d 959, 964 (N.D. Ill. 2000) (citing Maggard v. Apfel, 167 F.3d 376, 380 (7th Cir. 1999)).

In considering whether a child has an impairment or combination of impairments that functionally equals the severity of a listing, the six functional equivalence domains set forth in the regulations must be considered.  20 C.F.R. § 416.926a(b)(l).  They are:

1. Acquiring and using information;
2. Attending and completing tasks;
3. Interacting and relating with others;
4. Moving about and manipulating objects;
5. Caring for oneself; and
6. Health and physical well-being.

20 C.F.R. § 416.926a(b)(1)(i)-(vi); SSR 09-2p, 2009 WL 396032, at *1-2 (Feb. 18, 2009).  To qualify as functionally equivalent to a listing, the child's impairment "must result in [either] 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain."

20 C.F.R. § 416.926a(a).  The child has a "marked" limitation – i.e., one "that is 'more than moderate' but 'less than extreme'" – when the impairment "interferes seriously with [the child's] ability to independently initiate, sustain, or complete activities."  Id. § 416.926a(e)(2)(i).  The child has an "extreme" limitation when the impairment "interferes very seriously with [the child's] ability to independently initiate, sustain, or complete activities."  Id. § 416.926a(e)(3)(i).

### B.    Adult Standard – the Five-Step Evaluation Sequence

For claimants aged eighteen and over, the ALJ must follow five steps in evaluating a claim of disability.  See 20 C.F.R. § 416.920(a).  First, if a claimant is working at a substantial gainful activity, the claimant is not disabled.  Id. § 416.920(a)(4)(i).  Second, if a claimant does not have any impairment or combination of impairments that significantly limit physical or mental ability to do basic work activities, then the claimant does not have a severe impairment and is not disabled.  Id. § 416.920(a)(4)(ii).  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Appendix 1, the claimant is disabled.  Id. § 416.920(a)(4)(iii).  Fourth, if a claimant's impairments do not prevent doing past relevant work, the claimant is not disabled.  Id. § 416.920(a)(4)(iv).  Fifth, if a claimant's impairments (considering RFC, age, education and past work) prevent doing other work that exists in the local or national economy, a finding of disabled is warranted.  Id. § 416.920(a)(4)(v).  Significantly, the claimant bears the burden of proof at Steps One through Four, but the Commissioner bears the burden at Step Five.  Sacilowski, 959 F.3d at 434; Wells v. Barnhart, 267 F. Supp. 2d 138, 143-44 (D. Mass. 2003) (five-step process applies to SSI and DIB claims).

### C.    Opinion Evidence

An ALJ must consider the persuasiveness of all medical opinions in a claimant's case record.  See 20 C.F.R. § 416.920c.  A "medical opinion" is defined in the regulations as a

statement that identifies specific functional "limitations or restrictions" "about what [claimants] can still do despite [their] impairment(s)."  Id. § 416.913(a)(2).  The most important factors to be considered when the Commissioner evaluates the persuasiveness of a medical opinion are supportability and consistency; these are usually the only factors the ALJ is required to articulate.  Id. § 416.920c(b)(2); Gorham v. Saul, Case No. 18-cv-853-SM, 2019 WL 3562689, at *5 (D.N.H. Aug. 6, 2019).  Supportability "includes an assessment of the supporting objective medical evidence and other medical evidence, and how consistent the medical opinion or . . . medical finding is with other evidence in the claim."  Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 5859 (Jan. 18, 2017).  Other factors that are weighed in light of all of the evidence in the record includes the medical source's relationship with the claimant and specialization, as well as "other factors" that tend to support or contradict the medical opinion or finding.  See 20 C.F.R. § 416.920c(c).  "A medical opinion without supporting evidence, or one that is inconsistent with evidence from other sources, [is] not . . . persuasive regardless of who made the medical opinion."  Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. at 5854.  Medical source findings/opinions may not constitute substantial evidence if rendered by a source who was not privy to evidence that would materially detract from the force of the findings.  Ana D. v. O'Malley, C.A. No. 23-387WES, 2024 WL 3886655, at *3 (D.R.I. Aug. 20, 2024), adopted by text order (D.R.I. Sept. 4, 2024).

### D.    Claimant's Subjective Statements

A reviewing court will not disturb a clearly articulated credibility finding based on substantial supporting evidence in the record.  See Frustaglia, 829 F.2d at 195.  Guidance in evaluating the claimant's statements regarding the intensity, persistence and limiting effects of

subjective symptoms, is provided by SSR 16-3p, which directs the ALJ to consider the entire

case record, including the objective medical evidence, the individual's statements, statements

and other information provided by medical sources and other persons, and any other relevant

evidence, as well as whether the subjective statements are consistent with the medical signs and

laboratory findings.  2017 WL 5180304, at *2-5 (Oct. 25, 2017).  As the First Circuit has

emphasized, in the absence of direct evidence to rebut a claimant's testimony about subjective

symptoms, such statements should be taken as true.  Sacilowski, 959 F.3d at 441; Tegan S. v.

Saul, 546 F. Supp. 3d 162, 169 (D.R.I. 2021).  That is, if proof of disability is based on

subjective evidence and a credibility determination is critical to the decision, the subjective

statements must either be explicitly discredited or the implication of lack of credibility must be

so clear as to amount to a specific credibility finding.  Foote v. Chater, 67 F.3d 1553, 1561-62

(11th Cir. 1995); Vanessa C. v. Kijakazi, C.A. No. 20-363MSM, 2021 WL 3930347, at *4

(D.R.I. Sept. 2, 2021), adopted, 2021 WL 8342850 (D.R.I. Nov. 2, 2021).

    E.    Absenteeism

        When the symptoms of an impairment or combination of impairments would cause the

claimant periodically to be unable to attend work, it is reversible error if the ALJ fails

specifically to assess the issue of absenteeism.  Jacquelyn V. v. Kijakazi, C.A. No. 21-314MSM,

2023 WL 371976, at *5 (D.R.I. Jan. 24, 2023), adopted by text order (D.R.I. Mar. 7, 2023).

Remand is similarly required if the ALJ relies on the findings of non-examining physician

experts who did not address absenteeism because, for example, they did not see records

establishing the sheer scope of the claimant's medical concerns.  Jessica S. v. Kijakazi, C.A. No.

21-75MSM, 2022 WL 522561, at *4-6 (D.R.I. Feb. 22, 2022), adopted, 2022 WL 834019 (D.R.I.

Mar. 21, 2022).  That is, it is error for an ALJ to ignore the impact on the ability to work of

multiple impairments each of which could impact attendance, particularly where it is "undisputed that [the claimant's medical] issues required ongoing treatment throughout [an extended period]." Sacilowski, 959 F.3d at 435-36; see 20 C.F.R. § 416.923(b) (requirement for treatment of combined effect of multiple impairments). And when a treating source's longtime familiarity with a claimant and his ailments confirms that the absenteeism caused by the impairments is work-preclusive, reinforcing the already overwhelming evidence of disability, remand for an award of benefits may be appropriate, despite the claimant's capacity to engage in certain daily home activities. See Sacilowski, 959 F.3d at 440-41; Ogannes B. v. Kijakazi, C.A. No. 22-325WES, 2023 WL 5561108, at *12 (D.R.I. Aug. 29, 2023), adopted by text order (D.R.I. Sept. 13, 2023); Jacquelyn V., 2023 WL 371976, at *5. On the other hand, an ALJ's reliance on the finding of a state agency expert that a claimant can sustain work over a normal workday and workweek on an ongoing basis takes attendance-related limitations into consideration. Roberta L. v. O'Malley, C.A. No. 23-234-PAS, 2024 WL 3886654, at *7 (D.R.I. Aug. 20, 2024), adopted by text order (D.R.I. Sept. 4, 2024).

## IV.    **Analysis and Recommendation**

### A.    **Child Determination of No Disability**

Mindful that the Court cannot substitute its own judgment for that of the ALJ, I find no error in the ALJ's determination that, for the childhood period in issue (from the date of application until the eighteenth birthday – effectively one week), Plaintiff's impairments did not cause marked or extreme functional limitations impacting the six childhood functional equivalence domains. Importantly, for all of the period from alleged onset (January 1, 2020) through the eighteenth birthday, Plaintiff was in school and performing adequately, despite attendance issues. E.g., Tr. 404 (doing well academically; manages distance learning well). The

non-examining experts performed their review of the educational and medical records covering the entirety of this period and made findings that align with the applicable childhood standard. Tr. 139-41, 150. Further, although Dr. Egolf's opinion recites that her treatment of Plaintiff began in July 2019 (well prior to age eighteen) and focuses on Plaintiff's inability to leave the home throughout her treating relationship with him, her pivotal opinion (regarding absenteeism and attendance) is based not on Plaintiff's childhood functional capacity, but on Plaintiff's ability to work, specifically the likelihood that Plaintiff will be "***absent*** from work," or will "***start work late or leave work early***" to an extent that is work-preclusive. Tr. 1000-02 (emphasis in original). She does not address the six childhood domains nor does she focus on the adequacy of Plaintiff's school performance. See id. Indeed, Dr. Egolf's treating notes reflect that the structure and support of the school environment had been beneficial to Plaintiff. E.g., Tr. 757 ("[symptom]s better when: Structured, supported at school"). Nor does Dr. Singer's FMLA opinion address either the childhood domains or the pre-age-eighteen period; rather, it specifies that it is based on Plaintiff's status as an "adult child" who "is incapable of self-care because of a mental or physical disability." Tr. 994 (emphasis in original) (internal quotation marks omitted). And, as the ALJ correctly notes, Plaintiff's subjective statements focus "primarily on [his] symptoms and functioning since attaining age 18." Tr. 23. Thus, the ALJ did not err in affording them less weight as applied to the pre-eighteen period.

Based on the foregoing, I find no error in the ALJ childhood analysis and recommend that the Court affirm the ALJ's determination that Plaintiff did not suffer from a childhood disability.

**B.    Adult Determination of No Disability**

Once Plaintiff turned eighteen, the analytical framework shifted to the adult standard, which is focused on the claimant's ability to perform work.  In the adult context, I find that the ALJ stumbled badly by relying principally on his flawed lay analysis of the complex post-eighteen treating records most of which the non-examining experts did not see.  See Andrea T. v. Saul, C.A. No. 19-505WES, 2020 WL 2115898, at *5 (D.R.I. May 4, 2020) (remand is required when "the state-agency physicians were not privy to parts of [plaintiff's] medical record [which] detracts from the weight that can be afforded their opinions") (alterations in original) (internal quotation marks omitted), adopted by text order (D.R.I. June 5, 2020).

For starters, I find that Plaintiff is right that the findings of the initial-phase non-examining expert (Dr. Harris) are not supported by substantial evidence because they were entirely generated while Plaintiff was still in school; indeed, virtually all of what Dr. Harris saw relates to the pre-eighteen period.  Dr. Harris did not see any of the records summarized above from the post-high-school period.  As a result, she did not consider at all how Plaintiff functioned as an adult.  Specifically, Dr. Harris made her findings with no awareness of Plaintiff's ongoing medical management struggles as an adult or of his dramatic exacerbation of symptoms when a medication taper was tried in 2022, including that the resumption of treatment with medication in September 2022 led to amelioration of panic attacks but did not reduce symptoms to the point where Plaintiff was comfortable leaving the house.  This is not a close call – Dr. Harris's adult findings do not constitute substantial evidence and the ALJ erred in relying on them.

The Court's analysis of the reconsideration non-examining expert (Dr. Hahn) must be more nuanced because Dr. Hahn saw at least a handful of post-high school records (two appointments with Dr. Egolf and several with Dr. Singer).  However, Dr. Hahn made her findings unaware of the medically complex decision, see n.4 supra, to try a medication taper and

that Plaintiff's condition became "marked[ly]" severe as Dr. Egolf and the treating team struggled with recalibrating treatment in light of Plaintiff's longstanding limited response to medication and the side effects medication caused. Tr. 894. Dr. Hahn was also unaware that, after treatment with medication resumed, Plaintiff was still "not comfortable leaving the house," as Dr. Egolf clinically observed. Nor was Dr. Hahn aware of Dr. Egolf's opinion that Plaintiff had a limited response to medication and could not reliably attend work. For that reason, I find that Dr. Hahn was not "privy to evidence that would materially detract from the force of [her] findings." Ana D., 2024 WL 3886655, at *3. Therefore, Dr. Hahn's adult findings do not constitute substantial evidence, and the ALJ erred in relying on them. See Alcantara v. Astrue, 257 F. App'x 333, 334 (1st Cir. 2007) (per curiam) ("Absent a medical advisor's or consultant's assessment of the full record, the ALJ effectively substituted his own judgment for medical opinion."); Andrea T., 2020 WL 2115898, at *6 (when there are indications of worsening requiring medical interpretation, an adjudicator's failure to procure assistance from an expert requires remand for further proceedings); Mary K v. Berryhill, 317 F. Supp. 3d 664, 668 (D.R.I. 2018) ("[c]ourt does not know whether the non-examining state agency physicians would have rendered the same . . . opinions if they had all of the medical evidence").

Also flawed are the ALJ's reasons for rejecting Dr. Egolf's opinion as having little persuasive value.[10] For starters, each element of the Egolf opinion is explained; that is, the ALJ is simply wrong in condemning it as a mere box-check on a "form created by the claimant's attorney." Tr. 36. More substantively, the ALJ is wrong in labeling Dr. Egolf's well-founded clinical observations as resting solely on Plaintiff's subjective statements. See Hemmingson v.

---

[10] By contrast, I find no error in the ALJ's approach to the Singer opinion. On its face, it applies only to a three-month period, Tr. 996, and the ALJ is right in finding that the Singer opinion clashes with the balance of the record in opining, for example, that Plaintiff needed his mother to assist him with hygiene and bathing. Tr. 995.

<u>Saul</u>, No. 1:19-CV-693-SH, 2020 WL 210811, at *5 (W.D. Tex. Jan. 13, 2020) (improper for ALJ to reject treating psychiatrist's opinion as based on claimant's subjective complaints: "A psychiatrist does not merely transcribe a patient's subjective statements. Mental-health assessments normally are based on what the patient says, but only after the doctor assesses those complaints through the objective lens of her professional expertise.") (citing <u>Mischler v. Berryhill</u>, 766 F. App'x 369, 375 (7th Cir. 2019)); <u>Barnes v. Saul</u>, No. 18-cv-660-wmc, 2019 WL 6907397, at *5 (W.D. Wis. Dec. 19, 2019) (court should assume that claimant's long-standing, treating psychiatrist did not rely on subjective statements but rather relied on clinical observations, "a skill she is far more reliable to undertake than the ALJ"). And Dr. Egolf's opinions, particularly regarding absenteeism, are entirely consistent with, and supported by, her treating notes. Thus, far from being based on speculation, as the ALJ finds, they are firmly grounded not only on Dr. Egolf's clinical observations, but also on Plaintiff's longstanding and well-documented pattern (referenced by Dr. Egolf both in her treating notes and her opinion) of failing to appear, appearing late, or appearing but not engaging, for treatment and for school.

The only contrary perspective is the ALJ's seriously flawed lay interpretation of the post-file review records, which he succinctly sets out in the decision – that when Plaintiff abandoned efficacious treatment against medical advice, he could not work, but he recovered the ability to work without absenteeism once treatment resumed. Tr. 31. I find that the ALJ erred in adopting and relying on his own interpretation of a complex medical record featuring a significant worsening of symptoms when the well-qualified expert (Dr. Egolf) who was directly involved with the treatment in that record opined to work-preclusive symptoms. <u>See Randy M.</u>, 2021 WL 4551141, at *7 (ALJ's error in relying on experts who did not see much of file is compounded by flawed lay interpretation of the materials expert did not review). This is far from being a

circumstance where the ALJ's post-file-review analysis "results in the common-sense observation that the pre- and post-review records are similar, [and] there is no need for an additional medical expert." Andrea T., 2020 WL 2115898, at *8.

The ALJ's lay interpretation of this part of the medical record is also tainted because he is simply wrong. For example, the ALJ examines the clinical significance of Plaintiff's behavior in playing video games long into the night, causing function-impairing fatigue and resulting in sleep during much of the day. His decision cites this maladaptive conduct as evidence of Plaintiff's ability to perform a productive task (playing video games) and concludes that Plaintiff's decision to play video games most of the night is a choice and not a symptom. Tr. 34 ("despite his ongoing symptoms, he was still paying video games"; sleep issues "not due to mental health symptoms, but because he stayed up at night to play video games"). This approach ignores that treating sources considered the playing of video games for most of the night to be a symptom of anxiety and a strategy Plaintiff used to hold his racing thoughts at bay. See Tr. 549 ("some concern that pt is avoiding going to sleep due to fear that panic attack is more likely as he relaxes before sleep"). Similarly, extrapolating from Dr. Egolf's finding from Plaintiff's school period,[11] the ALJ inaccurately found that Dr. Egolf's notes reflect that Plaintiff's "symptoms were well-managed with Prozac for a couple of years." Tr. 36. This finding clashes dramatically with Dr. Egolf's actual treating notes, which state for example that, while Prozac reduced panic attacks to "now and then," with frequency "unclear," Plaintiff's other symptoms did not improve – as Dr. Egolf noted for example on August 24, 2021: "[t]ried higher dose of . . . Prozac . . . [n]o improvement . . . played video games last night and went to sleep at 4 AM . . .

---

[11] Thus, in December 2020, Bradley Hospital notes reflect that Prozac initially had a good effect in that Plaintiff was doing "okay" in school, with decreased panic attacks, although school attendance was poor, and anxiety was worsening. Tr. 716-21.

[r]acing thoughts are around most of the day . . . [an]xious thoughts interfere with sleep . . . [s]ome trouble falling asleep . . . [l]eaving the house rarely . . . [s]eems exhausted most of the time." Tr. 756-57. Importantly, the ALJ's erroneous reliance on his own interpretation of these complex records is also the foundation for his finding that Plaintiff's subjective statements lack credibility.

Based on the foregoing, I recommend that the Court find that the ALJ's decision that Plaintiff was not disabled once he became an adult is seriously flawed by multiple errors and that the case must be remanded for procurement of the assistance of a qualified medical expert and further proceedings to assess the entire medical record, including the Egolf opinion, the evidence of Plaintiff's physical complaints (which may be symptoms of mental illness) and Plaintiff's subjective statements.

### C.    Remand for Further Proceedings or Award of Benefits

Before closing, I turn to whether the remand I recommend should be for further proceedings or to award benefits. See Audrey P. v. Saul, C.A. No. 20-92MSM, 2021 WL 76751, at *12–13 (D.R.I. Jan. 8, 2021), adopted, 2021 WL 309233 (D.R.I. Jan. 29, 2021). This is a matter of discretion informed by whether the proof of disability is very strong and there is no contrary evidence. See Maricelys S. v. Saul, C.A. No. 18-479WES, 2019 WL 2950129, at *7 (D.R.I. July 9, 2019), adopted by text order (D.R.I. Nov. 7, 2019). Courts generally exercise the power to award benefits when it is "clear from the record that the claimant is entitled to benefits." Sacilowski, 959 F.3d at 437 (internal quotation marks omitted). It should be based on the reality that remand for further proceedings is unnecessary when the evidence of disability is "overwhelming" and there is no contrary evidence to rebut it. Id. at 439-41.

In this case, while the record for the post-age-eighteen period is replete with substantial evidence on which a finding of disability could be based, there is also contrary evidence pointing the other way that the Court lacks the legal authority or medical acumen to weigh and consider. See, e.g., n.6 *supra* (going to see friends); Tr. 876 (Plaintiff "broke up with his girlfriend a few days ago")[12]; Tr. 961 ("I went to my room and isolated since the day before I partied all day/night since 2 pm").  The contrary evidence also includes Dr. Hahn's reconsideration findings.  Thus, while these findings are not in themselves substantial evidence because of the material treating records that Dr. Hahn did not see, the Court cannot ignore that Dr. Hahn took at least some of the post-eighteen material into consideration so that her findings amount to a contrary indicator that an appropriate clinical analysis of the entirety of the material bearing on Plaintiff's struggle with medication management may yield the opinion that when Plaintiff chooses to engage with recommended treatment, which he is able to do, his symptoms are ameliorated sufficiently to permit work.  The contrary evidence also includes many relatively benign MSE findings of record, evidence that is complicated because many of the MSEs are incomplete due to the COVID pandemic.  In light of the decidedly mixed nature of this evidence, my recommendation is that the Court should exercise its discretion to remand for further proceedings rather than for an award of benefits.

V.     **Conclusion**

Based on the foregoing analysis, I recommend that Plaintiff's Motion to Reverse the Decision of the Commissioner (ECF No. 10) be GRANTED for further proceedings, but not for an award of benefits, and Defendant's Motion for an Order Affirming the Decision of the Commissioner (ECF No. 11) be DENIED.  Any objections to this report and recommendation

---

[12] I note that a record produced to the Appeals Council, which was not seen by the ALJ, suggests that this may have been an on-line relationship.  Tr. 53.

must be specific and must be served and filed with the Clerk of the Court within fourteen days of service of this report and recommendation.  <u>See</u> Fed. R. Civ. P. 72(b); DRI LR Cv 72.  Failure to file specific objections in a timely manner constitutes waiver of the right to review by the District Court and the right to appeal the District Court's decision.  <u>See</u> <u>Brenner v. Williams-Sonoma, Inc.</u>, 867 F.3d 294, 297 n.7 (1st Cir. 2017); <u>Santos-Santos v. Torres-Centeno</u>, 842 F.3d 163, 168 (1st Cir. 2016).

<u>/s/ Patricia A. Sullivan</u>
PATRICIA A. SULLIVAN
United States Magistrate Judge
February 18, 2025